23 sc 3320 ECT/ECW

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| [UNDER SEAL], | § | ORIGINAL COMPLAINT |
| | § | FOR VIOLATIONS OF |
| Plaintiff, | § | FEDERAL FALSE |
| | § | CLAIMS ACT |
| | § | |
| | § | **FILED UNDER SEAL** |
| v. | § | PURSUANT TO 31 U.S.C. |
| | § | § 3730 (b)(2) |
| | § | |
| | § | DO NOT PUT ON PACER |
| | § | |
| | § | DO NOT PLACE IN PRESS |
| [UNDER SEAL], | § | BOX |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |

RECEIVED
OCT 30 2023
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**RELATOR'S ORIGINAL COMPLAINT**

SCANNED
OCT 30 2023 mg
U.S. DISTRICT COURT MPLS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex. rel.* WADE RINER | § | CIVIL NO. 23 sc 3320 ECT/ECW |
| Plaintiff, | § | RELATOR WADE RINER'S ORIGINAL COMPLAINT |
| v. | § | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (b)(2) |
| LAFAYETTE CLUB, ET AL. | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

RECEIVED
OCT 30 2023
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

The Paycheck Protection Program ("PPP") was enacted to provide forgivable, emergency loans to small businesses struggling to make payroll and ends meet during the global pandemic. While PPP served as a lifeline to small businesses in need, it also attracted opportunistic and unworthy recipients, such as the Defendant country clubs, who fraudulently obtained more than $7 million in PPP funds, at the expense of small businesses truly in need. Relator Wade Riner ("Relator" or "Riner") brings this action pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–32, and seeks to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States of America and on his own behalf. Relator respectfully alleges the following:

## I. INTRODUCTION

1. In the wake of the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, commonly referred to as the "CARES Act". The CARES Act was intended to provide emergency financial support to the millions of Americans suffering the economic effects caused by the pandemic.

2. Part of the CARES Act emergency aid was PPP, which offered billions of dollars in forgivable, emergency loans to small businesses subject to the vagaries of an economic downturn, like restaurants and retailers. To receive PPP funds, a business was required to certify to the United States Small Business Administration that they were qualified to receive the low-interest loan, that their loan request was *necessary for continued operation*, and that they will use the funds exclusively for payroll expenses, rent,

mortgage, interest, or utilities during a covered period. Throughout 2020 and 2021, PPP loan applicants were required to certify that they were eligible to receive PPP loans.

3. Unfortunately, PPP also attracted opportunists and fraudsters who were not the intended recipients of such aid.

4. Numerous trade groups and similar associations lobbied Congress for eligibility to apply for PPP loans. Among those groups were community associations, including housing cooperatives, condominium associations, and property owner associations.

5. In December 2020, Congress passed amendments to the CARES Act which allowed housing cooperatives to apply for PPP loans. Not-for-profit country clubs were not included in the amendments. The list of eligible recipients expanded once more near the end of the final PPP application period—when the American Rescue Plan Act of 2021 ("ARPA") was signed into law on March 11, 2021. While certain non-for-profit country clubs were then eligible for PPP loans, their eligibility only commenced in the *final weeks* of the application period, and only if they met the specific 501(c)(7) tax-exempt status. *See* 86 Fed. Reg. 15083 (explaining that the American Rescue Plan Act changes only "apply to PPP loans approved, and loan forgiveness applications submitted, *on or after March 11, 2021*").

6. Despite the law, Defendants applied for PPP loans anyway, between 2020 and February 2021. In doing so, Defendants falsely certified to the United States that they were eligible for funding and needed the loans. The false certifications included the

following on the application: "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them."

7. Defendants sought emergency funds intended for small businesses struggling to survive the pandemic even though they had millions of dollars in annual revenue that was not subject to the unpredictable swings of a consumer-based economy. Unlike restaurants and other small businesses trying to survive in the midst shutdowns and reduced demand, Defendants' revenue is generated by assessments on their wealthy membership. By fraudulently obtaining PPP loans, the rich got richer while depriving the intended recipients the boost Congress intended.

8. In total, the Defendant country clubs fraudulently obtained more than $7 million dollars in forgivable funding, directly depriving the United States of millions of dollars and preventing needy small businesses from receiving congressionally approved loans.

9. As Acting Assistant Attorney General Brian M. Boynton of the Department of Justice's Civil Division explained:

> PPP loans were intended to provide critical relief to small businesses so that they could pay employees and maintain operations . . ..The department is committed to pursuing those who knowingly violated the requirements of the PPP or other Covid-19 assistance programs and obtained relief funds to which they were not entitled.

10. With this qui tam action, the Relator seeks to assist the DOJ with this pursuit.

## II. PARTIES

11. Relator Wade Riner is a citizen of Texas. Through his membership in homeowner associations in Florida, Riner learned that they had applied for millions of dollars of federal relief through PPP loans, even though they were not qualified under the CARES Act. Riner's discovery led him to investigate other nonprofit and not-for-profit entities in the United States, who similarly obtained PPP funds through fraudulent means, including Defendants.

12. Defendant Lafayette Club ("Lafayette") is a not-for-profit country club located at 2800 Northview Rd., Minnetonka Beach, Minnesota.

13. Defendant Minneapolis Golf Club ("Minneapolis Club") is a not-for-profit country club located at 2001 Flag Ave., St. Louis Park, Minnesota.

14. Defendant Minnesota Valley Country Club, Inc. ("Minnesota Valley") is a not-for-profit country club located at 6300 Auto Club Rd., Bloomington, Minnesota.

15. Defendant Southview Country Club ("Southview") is a not-for-profit country club located at 239 Mendota Rd., Saint Paul, Minnesota.

16. Defendant Hazeltine National Golf Club ("Hazeltine") is a not-for-profit country club located at 1900 Hazeltine Blvd., Chaska, Minnesota.

17. Defendant Midland Hills Country Club ("Midland Hills") is a not-for-profit country club located at 2001 Fulham St., Roseville, Minnesota.

18. Defendant Town and Country Club of St. Paul ("Club of St. Paul") is a not-for-profit country club located at 300 Mississippi Blvd., Saint Paul, Minnesota.

## III. RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

19. Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents who at all times acted on behalf of the named Defendants and within the course and scope of their employment or agency.

## IV. JURISDICTION AND VENUE

20. Jurisdiction and venue are proper in the District of Minnesota, pursuant to the FCA (31 U.S.C. §§ 3729–33), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. §§ 3729–30, and the many of the Defendants can be found in this district. Because Defendants can be found in this state, personal jurisdiction is also proper.

## V. ORIGINAL SOURCE AND DISCLOSURES

21. There are no bars to recovery under 31 U.S.C. § 3730(e). To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and had provided that information to the United States prior to filing the complaint by serving a voluntary Pre-Filing Disclosure Statement.

22. As required by 31 U.S.C. §§ 3730(b) and (e), Relator submitted an Original Disclosure Statement to the Attorney General of the United States and the United States Attorney for the District of Minnesota, as well as all material evidence and information, prior to filing and serving this Original Complaint.

## VI. THE PAYCHECK PROTECTION PROGRAM

23. On March 27, 2020, the CARES Act, Pub. L. 116-136, 134 Stat. 281, created PPP, initially making $349 billion in forgivable loans available to small businesses impacted by the COVID-19 pandemic. The U.S. Small Business Administration ("SBA") administers PPP, promulgates the rules and regulations governing PPP, and guarantees all PPP loans made by lenders.

24. The PPP allowed small businesses (less than 500 employees) to obtain forgivable loans of up to $10 million, at 1% interest, to cover payroll costs, rent, mortgage interest, utilities, and other overhead expenses for a "covered period." CARES Act § 1102(a)(2)(36)(D)–(E), 134 Stat. at 288–90.

25. PPP loans were processed and approved by qualified lenders approved by the SBA. Lenders issued PPP loans without the SBA's prior review or express and individualized approval, but they agreed to be responsible for determining borrower eligibility under the SBA's criteria. The lenders were "deemed to have been delegated authority by the [SBA] Administrator to make and approve covered loans." CARES Act § 1102(a)(2)(36)(F)(ii), 134 Stat. at 290.

26. For processing the PPP loans, the SBA reimbursed participating lenders with a processing fee equal to the amount of 5% of loans up to $350,000; 3% of loans between $350,000 and $2,000,000; and 1% on loans of at least $2,000,000. *See* CARES Act § 1102(a)(2)(36)(P), 134 Stat. at 293. Additionally, although the lenders funded the PPP loans with their own funds, the SBA 100% guaranteed these loans.

27. PPP loans are also subject to complete forgiveness. CARES Act § 1106, 134 Stat. at 297–302. And within 90 days of forgiveness , the SBA remits to the lender the full amount of the forgiven loan, plus any accrued interest. *Id.* § 1106(c)(3), 134 Stat. at 298.

28. PPP was a program under the Small Business Act, Section 7(a). Generally speaking, a key eligibility requirement for Section 7(a) SBA loans is that the applicant be a business operating for profit.

29. Pursuant to the CARES Act, PPP loans were originally available only to a "business concern, nonprofit organization, veterans organization,[] Tribal business," or sole proprietorship that employed no more than 500 employees. *See* CARES Act § 1102(a)(2)(36)(D), 134 Stat. at 288. Nonprofit-organization eligibility, however, was limited to tax exempt 501(c)(3) organizations. *Id.* § 1102(a)(2)(36)(A)(viii).

30. Eligibility for PPP is also spelled out in Interim Final Rule #1 published in the Federal Register on April 15, 2020, which answered the question, "How do I determine if I am ineligible?" as follows: "Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in the SBA's Standard Operating Procedure (SOP) 50 10 Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible." 85 Fed. Reg. 20812.

31. The provisions of the Code of Federal Regulations referred to in response to the ineligibility question clearly state that private clubs are not eligible for SBA loans. "*Private clubs* and businesses which limit the number of memberships for reasons other

than capacity[,]" are ineligible. 13 CFR § 120.110(i) (emphasis added). *See also* 13 CFR § 120.100(a) ("non-profit businesses" are ineligible).

32. The administrative notes interpreting the rationale behind 120.110(i) state, "to be eligible for SBA financial assistance, the products and services of a business must be available to the general public." 60 Fed. Reg. 64356, 1995 WL 739731, at *64360 n.3 (Dec. 15, 1995). Therefore, Congress and the SBA plainly intended to limit SBA loans, including PPP loans, to for-profit businesses and to exclude private country clubs.

33. Applicants for PPP loans were required to certify to a participating SBA-approved lender and to the SBA that they are eligible to receive the loan under the rules in effect at the time of their application. For example, the April 2020 SBA Form 2483 (the PPP application at the time) required applicants to certify as follows:

**Paycheck Protection Program**
**Borrower Application Form**

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

CERTIFICATIONS AND AUTHORIZATIONS

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).
- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.
- To the extent feasible, I will purchase only American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.
- Any loan received by the Applicant under Section 7(b)(2) of the Small Business Act between January 31, 2020 and April 3, 2020 was for a purpose other than paying payroll costs and other allowable uses loans under the Paycheck Protection Program Rule.

34. The PPP applications also required applicants to certify that the loan request is necessary to support their ongoing operations. As SBA Form 2483 required:

CERTIFICATIONS

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

_____ The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

_____ Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

35. Recognizing that some applicants might be confused by the "economic uncertainty" certification, the SBA provided a "safe harbor" providing that "any borrower that applied for a PPP loan and repays the loan in full by May 7, 2020, will be deemed by SBA to have made the required certification in good faith." Interim Final Rule #4 (85 Fed. Reg. 23450 published April 28, 2020). Interim Final Rule #4 additionally noted that the SBA would give additional guidance before May 14, 2020 concerning this certification, especially in helping PPP borrowers evaluate whether they "may have misunderstood or misapplied the statutory standard." On May 13, 2020, the SBA clarified in its Frequently Asked Questions section of Interim Final Rule # 9, (85 Fed. Reg. 29845 published May 19, 2020) stating that "borrowers must make this certification in good faith, taking into account their current business activity and their *ability to access other sources of liquidity* sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." (Emphasis added.)

36. PPP applications additionally required applicants' authorized representatives to specifically certify that all information provided on the application is true and accurate in all material respects as well as to certify their understanding that a false statement made in order to obtain a guaranteed loan from the SBA is punishable under the law. Again, from the April 2020 SBA Form 2483:

____ I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

37. Finally, when PPP loan recipients apply for forgiveness of their loan, they must further certify, through their authorized representative, that they have "complied with all requirements in the Paycheck Protection Program Rules," including the statute passed by the CARES Act and the subsequent amendments. From SBA Form 3508S:

**By Signing Below, You Make the Following Representations and Certifications on Behalf of the Borrower:**
The Authorized Representative of the Borrower certifies to all of the below by **initialing** next to each one.

____ The Borrower has complied with all requirements in the Paycheck Protection Program Rules (Sections 7(a)(36), (7)(a)(37), and 7A of the Small Business Act, the PPP interim final rules, and guidance issued by SBA through the date of this application), including the rules related to:

- eligible uses of PPP loan proceeds;
- the amount of PPP loan proceeds that must be used for payroll costs (including proprietor expenses for Borrowers that applied for loans using SBA Forms 2483-C or 2483-SD-C);
- the calculation and documentation of the Borrower's revenue reduction (if applicable); and
- the calculation of the Borrower's Requested Loan Forgiveness Amount.

Information regarding these requirements may be found in the Form 3508S Instructions and the Paycheck Protection Program Rules.

38. PPP was originally funded by Congress with $349 billion, but the funds were quickly depleted on April 16, 2020—only weeks after the CARES Act passed. On April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. 116-139, 134 Stat. 620, in which Congress allocated an additional $320 billion in funding.

39. Congress further expanded PPP at the end of the year. In the Consolidated Appropriations Act, 2021, Pub. L. 116-260. The Consolidated Appropriations Act, 2021, added $284.5 billion to the PPP. Additionally, the Act allowed certain entities to obtain "second draw" PPP loans. By May 5, 2021, these additional funds had also been depleted.

40. Congress expanded the list of eligible recipients one last time near the end of the final PPP application period—when the American Rescue Plan Act of 2021 was signed into law on March 11, 2021, and included most 501(c) organizations as "additional covered nonprofit entities." While certain nonprofit country clubs were then eligible for PPP loans, they were only eligible in the *final weeks* of the application period and only if they met the specific 501(c)(7) tax-exempt status. *See* 86 Fed. Reg. 15083 (explaining that the American Rescue Plan Act changes only "apply to PPP loans approved, and loan forgiveness applications submitted, *on or after March 11, 2021*") (emphasis added).

41. For entities that applied for a second-draw PPP loan, they again were required to certify their eligibility under the effective rules. SBA Form 2483-SD provides:

**Paycheck Protection Program**
**Second Draw Borrower Application Form**
**Revised March 18, 2021**

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) and the Department of the Treasury (Treasury) implementing Second Draw Paycheck Protection Program Loans under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, and Title V of the American Rescue Plan Act of 2021 (the Paycheck Protection Program Rules).
- The Applicant, together with its affiliates (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; (3) if NAICS 72, employs no more than 300 employees per physical location; (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business, a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151, or an Internet-only news or periodical publisher assigned NAICS code 519130 and engaged in the collection and distribution of local or regional and national news and information, employs no more than 300 employees per location; or (5) if a 501(c)(3) organization, an eligible 501(c)(6) organization, other eligible 501(c) organization, eligible destination marketing organization, employs no more than 300 employees per physical location.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules including the prohibition on using loan proceeds for lobbying activities and expenditures. If Applicant is a news organization that became eligible for a loan under Section 317 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, proceeds of the loan will be used to support expenses at the component of the business concern that produces or distributes locally focused or emergency information. If the Applicant is an Internet-only news or periodical publisher that became eligible for a loan under Section 5001 of the American Rescue Plan Act of 2021, the proceeds of the loan will be used to support expenses at the component of the business or organization that supports local or regional news.
- I understand that SBA encourages the purchase, to the extent feasible, of American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.

42. Additionally, second-draw PPP applications required a second certification that all information provided on the application was true and accurate in all material respects as well as to certify their understanding that a false statement made in order to obtain a guaranteed loan from the SBA is punishable under the law. SBA Form 2483-SD states:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

43. Finally, *qui tam* lawsuits are an appropriate remedy for violations of PPP rules and regulations. In remarks given on February 17, 2021, for example, Acting Assistant Attorney General Brian M. Boynton explained: "It is clear to me and my colleagues in the Civil Division-and I'm sure to all of you-that the FCA will play a significant role in the coming years as the government grapples with the consequences of this pandemic." As he further pointed out, "[t]he vast majority of the funds distributed under these programs have gone to eligible recipients. Unfortunately, some individuals and businesses applied for-and received- payments to which they were not entitled." Accordingly, "*qui tams* will continue to be an essential source of new leads, and the Department [of Justice] will continue to rely on whistleblowers to help root out the misuse and abuse of taxpayer funds."

## VII. DEFENDANTS' FRAUD

44. Defendants knowingly represented to the SBA and participating lenders that they were qualified to receive PPP loans, when in truth they are not-for-profit country clubs

which were ineligible for PPP loans. Defendants also knowingly misrepresented their need for these loans. Further, Defendants' fraud deprived the United States of the ability to loan appropriated funds to qualified small businesses struggling to survive the pandemic. Indeed, most of the loans given to Defendants were approved before the PPP funding ran out. In other words, Defendants took millions of dollars from a finite pool of funds, before less sophisticated, qualified small businesses even had the chance to apply.

45. Defendants made these false certifications even though they knew or recklessly disregarded the fact that they were ineligible for PPP loans. Not-for-profit country clubs were ineligible under SBA Section 7(a), the CARES Act, and SBA's guidance and regulations. In fact, SBA published—and, upon congressional amendments, updated, FAQs for PPP loans including an answer to question, "Who is Eligible" and not-for-profit country clubs were *never* included in the answer to that question. In addition, "non-profit businesses" were explicitly excluded in the official guidance, which should have alerted Defendants to their ineligibility.

46. Defendants' other false certifications—that economic uncertainty made PPP loans necessary to support their ongoing operations—were in bad faith, given Defendants' property interests and ability to raise money. The SBA required applicants to make this certification in good faith and specifically admonished applicants to consider "their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." The SBA even gave an example of a business that could *not* make this certification: "it is unlikely that a public

company with substantial market value and access to capital markets will be able to make the required certification in good faith." There is no circumstance under which a not-for-profit country club could certify in good faith that they do not have access to other sources of liquidity to support their ongoing operations. While Defendants were not public companies, they still had substantial value of their own and access not only to capital markets, but also a more readily available source of funds. Unlike businesses, which rely on sales by consumers, or even 501(c)(3) nonprofits, which rely on donations, not-for-profit country clubs do not rely on funding subject to the whims of consumer demand. Instead, they rely on mandatory assessments and/or dues and fees from their membership. Defendants' members are typically wealthy, often with net worth of tens of millions of dollars, and it would not have been a hardship to raise their assessments and/or dues and fees in order to continue operations, even assuming that the pandemic created an economic hardship for Defendants.

47. Furthermore, the country clubs, which own significant property, have statutory authority and powers to make contracts and guaranties, incur liabilities, secure its obligations by mortgage, and pledge its property interests or income. These powers further support the conclusion that Defendants' false certifications were knowing or at the very least, reckless.

48. Defendants' false certifications to the SBA and the lenders were material, because the SBA and lenders relied on the honesty of applicants to process PPP loans as

quickly as possible in order to provide emergency relief to small businesses, consistent with the law's intent.

49. Moreover, Defendants compounded their fraud by applying for loan forgiveness from the United States. Defendants' loans were in fact, forgiven, thus depriving the United States of the loan principal and accrued interest. The loan forgiveness is equal to hundreds of thousands, if not millions of dollars per Defendant, and tens of millions of dollars in total.

50. The majority of the Defendants went even further and applied for a *second* loan, yet again fraudulently and falsely claiming that they were eligible entities under the CARES Act.

51. The damages suffered by the United States extend beyond the loans. The damages also include the Government's incidental expenses supporting PPP loans. For example, Defendants induced the United States to pay fees to banks and other financial institutions in order to execute these fraudulent loans.

52. Each Defendant knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." They also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Defendants each applied for and received loans in violation of the FCA as summarized below:

| Defendant | # of Loans Rec'd | Loan(s) Amount | Date Loan(s) Approved | Loan Forgiven? | Amount of Loan Forgiven |
|---|---|---|---|---|---|
| Lafayette Club | 2 | $928,300.00<br>$956,050.00 | 4/10/2020<br>2/14/2021 | Yes<br>Yes | $933,870.00<br>$960,503.00 |
| Minneapolis Golf Club | 2 | $431,500.00<br>$466,875.00 | 4/10/2020<br>1/20/2021 | Yes<br>Yes | $424,042.00<br>$449,777.00 |
| Minnesota Valley Country Club, Inc. | 1 | $608,000.00 | 4/6/2020 | Yes | $614,330.00 |
| Southview Country Club | 1 | $348,200.00 | 4/6/2020 | Yes | $340,081.00 |
| Hazeltine National Golf Club | 2 | $822,700.00<br>$797,458.00 | 4/6/2020<br>2/2/2021 | Yes<br>Yes | $827,118.00<br>$803,051.00 |
| Midland Hills Country Club | 1 | $529,438.00 | 4/5/2020 | Yes | $532,408.00 |
| Town and Country Club of St. Paul | 2 | $787,600.00<br>$702,067.00 | 4/15/2020<br>1/31/2021 | Yes<br>Yes | $792,326.00<br>$706,010.00 |

53. Lafayette applied for and received a PPP loan for $928,300, approved on April 10, 2020. Lafayette applied for and received a second PPP loan of $956,050, approved on February 14, 2021. In Lafayette's applications, it knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application [wa]s submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Lafayette applied for and received forgiveness from the United States for both loans, in the total amount of $1,894,373, including interest.

54. Minneapolis applied for and received a PPP loan of $431,500, approved on April 10, 2020. Minneapolis applied for and received a second PPP loan of $446,875, approved on January 20, 2021. In its applications, Minneapolis knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application [wa]s submitted." It also falsely certified that "[c]urrent economic uncertainty

makes this loan request necessary to support the ongoing operations of the Applicant." Minneapolis has applied for and received forgiveness from the United States for both loans, including interest, in the total amount of $873,819.

55. Minnesota Valley applied for and received a PPP loan of $608,000, approved on April 6, 2020. In Minnesota Valley's application, it knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application [wa]s submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Minnesota Valley applied for forgiveness, and the United States forgave this loan, through its agent lender, in the amount of $614,330, including interest.

56. Southview applied for and received a PPP loan in the amount of $348,200, approved on April 6, 2020. In Southview's application, it knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application [wa]s submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Southview applied for forgiveness, and through its agent lender, the United States forgave this loan in the amount of $340,081.

57. Hazeltine applied for and received a PPP loan for $822,700, approved on April 6, 2020. Hazeltine applied for and received a second PPP loan of $797,458, which was approved on February 2, 20201. In its applications, Hazeltine knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e]

application [wa]s submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Hazeltine applied for and received forgiveness from the United States for both loans in the total amount of $1,630,169, including interest.

58. Midland Hills applied for and received a PPP loan of $529,438, which was approved on April 5, 2020. In its application, Midland Hills knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application [wa]s submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Midland Hills applied for and obtained forgiveness from the United States for its loan in the amount of $532,408, including interest.

59. Club of St. Paul applied for and received a PPP loan for $787,600, approved on April 15, 2020. Club of St. Paul applied for and received a second PPP loan in the amount ofr $702,067, which was approved on January 31, 2021. In its applications, Club of St. Paul knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application [wa]s submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Club of St. Paul applied for and received forgiveness from the United States both loans in the total amount of $1,498,336, including interest.

## VIII. ACTIONABLE CONDUCT BY DEFENDANTS

### A. False Claims Act

60. This is an action to recover damages and civil penalties on behalf of the United States and the Relator arising from false or fraudulent statements, claims, and acts by Defendants made in violation of the FCA, 31 U.S.C. §§ 3729–32.

61. The FCA provides that any person who:

> (A) knowingly presents, or causes to be presented, a false claim or fraudulent claim for approval; [or]
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> …

is liable to the Government for a civil penalty not less than $11,665 and not more than $22,331 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

62. The FCA defines "claim" as:

> (A) [] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> (i) is presented to an officer, employee, or agent of the United States; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> (31) provides or has provided any portion of the money or property requested or demanded; or

> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. …

31 U.S.C. § 3729(b)(2).

63. The FCA allows any person with knowledge of a fraud against the government to bring an action in federal district court for themselves and on behalf of the government, and to share in any recovery as authorized by 31 U.S.C. § 3730.

64. Based on these provisions, Riner, on behalf of the United States and himself, seeks to recover damages and civil penalties arising from Defendants' violations of the FCA.

**B. <u>Defendants' violations of the FCA</u>**

**i. Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

65. In 2020 and 2021, Defendants knowingly presented false and fraudulent claims for payment and approval directly to their lenders, deputized agents of the United States government, which falsely stated that they were eligible entities for PPP loans and that they needed the loans in order to support their ongoing operations. Defendants compounded their fraud when they applied for loan forgiveness and falsely certified that they complied with all the requirements of the PPP Rules.

66. Due to their false certifications, Defendants wrongly obtained millions of dollars of forgivable loans that, even if paid back, were set at a below-market interest rate. These loans were disbursed at the expense of countless American businesses who qualified for, but could not obtain PPP loans, because the funding ran out. Additionally, the United States has paid millions of dollars to lenders for the forgiven loans, which is now lost.

Accordingly, the United States has suffered actual damages, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**ii. Making or Using—or causing to be made or used—False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

67. In 2020 and 2021, Defendants made, used, or caused to be made or used, false records or statements, which were material to Defendants' false or fraudulent claims paid and approved by the government.

68. Defendants knew that their applications falsely certified that they were entities eligible to receive PPP loans and they falsely certified that the PPP loans were necessary to support ongoing operations. Defendants knowingly caused these false claims, which were material to the lenders' eventual claims to the United States for additional interest and loan-forgiveness reimbursement.

69. Defendants collectively borrowed millions of dollars of forgivable loans that their lenders in turn received millions of dollars for administering and reimbursing. The United States disbursed this money to lenders at the expense of countless American businesses which qualified for but could not obtain PPP loans because the funds ran out. The United States has paid millions of dollars to lenders for the forgiven loans, which is now lost. Accordingly, the United States has suffered millions of dollars in actual damages and is further entitled to recover treble damages plus a civil monetary penalty for each false claim.

**C. Defendants' violations of the FCA are material.**

70. A false or fraudulent claim under subsection (a)(1)(A) or a false record or statement under subsection (a)(1)(B) subjects a defendant to liability if it is material. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

71. The United States set up a multi-part process of reliance on others in order to expeditiously execute the PPP program and keep the economy on track in the midst of a global pandemic. Congress and the SBA authorized certain lenders to issue PPP loans without the government's prior review or express approval to expedite the process. Although lenders were delegated the responsibility for determining borrower eligibility, they were directed to use forms promulgated by the SBA which included numerous certifications, including a certification of eligibility.

72. The United States, through its agent lenders, relied heavily on these certifications. Indeed, when the PPP was originally funded with $349 billion, those funds were depleted less than three weeks after the CARES Act passed.

73. To quickly process loans, lenders used an automated tool that compared loan data against publicly available information and identified anomalies indicative of non-compliance. *See* SBA Procedural Notice, No. 5000-20092 (Feb. 10, 2021).[1] The data was

[1] *Available at* https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20092%20-%20Revised%20PPP%20Procedures%20to%20Address%20Hold%20Codes-508.pdf

largely limited to information about the number of employees and payroll of applicants, which were key components to qualification. However, the automated tool was unable to detect whether the entities qualified as for-profit businesses in need, and instead relied on applicants' good faith certifications that they qualified for PPP loans in the first instance.

74. The SBA sometimes conducted additional data analysis beyond the automated tool to detect ineligible applicants. But again, their data analysis was limited to the data provided by applicants and consequently, they were unable to identify unqualified entities.

75. By making false and fraudulent misrepresentations that they were eligible for PPP loans and complied with all PPP requirements, Defendants defrauded the United States and its agent lenders. Defendants' certifications of qualification and compliance, when they knew they did not qualify due to their not-for-profit country-club status, not only had the natural tendency to influence the award and forgiveness of PPP loans, but in fact did so. Defendants' fraudulent and false certifications specifically evaded the compliance measures used by the United States and its participating lenders. But for their false certifications, Defendants would not have received PPP loans or forgiveness for those loans.

## IX. CAUSES OF ACTION

### COUNT I
### PRESENTATION OF FALSE OR FRAUDULENT CLAIMS
### (31 U.S.C. § 3729(A)(1)(A))

76. Relator restates and incorporates by reference the foregoing allegations.

77. In 2020 and 2021, Defendants knowingly presented or caused to be presented false or fraudulent claims for approval and forgiveness of PPP loans by the United States Government.

78. Specifically, Defendants submitted or caused the submission of false or fraudulent claims when they falsely and fraudulently stated that they were eligible entities for PPP loans and they needed the loans to support their ongoing operations, although they knew or should have known that was not true.

79. The false PPP applications were "claims" under the FCA because they were "request[s] or demand[s] … for money or property … that" were "presented to an officer, employee, or *agent* of the United States." 31 U.S.C. § 3729(b)(2)(A)(i) (emphasis added). Indeed, the applications were requests for money submitted directly to financial institutions as agents of the United States. Alternatively, the PPP applications were claims because the financial institutions were "contractor[s], grantee[s], or other recipient[s]" of money who would be "reimburse[d] … for any portion of the money or property which [wa]s requested or demanded." *Id.* § 3729(b)(2)(A)(ii).

80. Defendants also submitted or caused submissions of false claims when they applied for forgiveness of their PPP loans and falsely and fraudulently certified that they complied with all the requirements of the PPP Rules, although they knew or should have known they did not.

81. The applications for forgiveness were also claims under the FCA because they further "request[ed] or demand[ed]" money or property from the United States, like their initial PPP loan applications. *See* 31 U.S.C. § 3729(b)(2)(A).

82. The United States, unaware of the material falsity of the claims made or caused to be made by Defendants, approved, paid, and forgave loans made by the government's agents for millions of dollars in loans for which they did not qualify, at the expense of small businesses in need.

83. By reason of these loan approvals, payments and their subsequent forgiveness, the government has been damaged in an amount yet to be determined. Accordingly, the United States suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty for each presentment of a false claim.

**COUNT II**
**MAKING OR USING FALSE STATEMENTS MATERIAL TO FALSE OR FRAUDULENT CLAIMS**
**(31 U.S.C. § 3729(A)(1)(B))**

84. Relator realleges and incorporates by reference the foregoing allegations.

85. In 2020 and 2021, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the government.

86. Defendants' statements of eligibility in their PPP applications were false. Defendants knew that these statements were false because Defendants knew that they were not business entities eligible to receive PPP loans.

87. Defendants' statements in their PPP applications that they needed the loans in order to support their ongoing operations were false. Defendants knew that these statements were false because they knew that they could continue their ongoing operations without a PPP loan.

88. Defendants' statements in their applications for forgiveness that they complied with all the requirements of the PPP Rules were false. Defendants knew that these statements were false because they were ineligible for PPP loans and did not need the loans in order to support their ongoing operations.

89. Defendants' false statements were material to their false and fraudulent claims made to the United States and their agents.

90. Defendants' false statements were material because the government's lending agents—and by extension the United States government itself—heavily relied on these certifications to expeditiously process PPP loans with the assistance of an automated tool that accepted these certifications. Defendants' false statements thus not only had the natural tendency to influence the award and forgiveness of PPP loans, but in fact, did so.

91. The United States, unaware of the material falsity of the claims made or caused to be made by Defendants, approved, paid, and participated in payments and forgiveness for ineligible recipients.

92. But for Defendants' materially false statements, they would not have received the PPP loans.

93. Because of their false or fraudulent statements, Defendants obtained millions of dollars in PPP loans to which they are not entitled. The submission to the federal government of claims for payment was a foreseeable consequence of this fraud. As a result, the United States has suffered substantial damages and is entitled to recover treble damages and civil monetary penalties.

## X. PRAYER FOR RELIEF

WHEREFORE, Riner respectfully requests the Court enter judgment against Defendants for violations of the FCA and award the following:

a. damages in the amount of three times the actual damages suffered by the United States as a result of Defendants' conduct;

b. Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

c. The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

d. All costs and expenses of the litigation, including attorneys' fees and costs of court; and

e. All other relief on behalf of Relator and the United States that the Court deems just and proper.

## XI. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully submitted,

Dated: October 30, 2023

**PARKER DANIELS KIBORT LLC**

By: /s/ *Christopher M. Daniels*
Christopher M. Daniels (#271809)
Lori A. Johnson (#311443)
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
daniels@parkerdk.com
johnson@parkerdk.com

**WRIGHT CLOSE & BARGER, LLP**

By: /s/ *Randall C. Owens*
Randall C. Owens* (TX Bar No. 15380700)
Michael Adams-Hurta* (TX Bar No. 24097860)
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Telecopier: (713) 572-4320
owens@wrightclosebarger.com
hurta@wrightclosebarger.com

* *Pro Hac Vice to Be Filed*

***Attorneys for Relator Wade Riner***